IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-00236-REB-MEH

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER, on behalf of its members, and
MARGARET DENNY, on behalf of herself and a proposed class of similarly situated persons,

      Plaintiffs,

v.

SAGE HOSPITALITY RESOURCES, LLC,
SAGE OXFORD, INC.,
WALTER ISENBERG, and
JOHN DOES 1-5,

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are Defendant Sage Hospitality Resources' Motion to Dismiss Plaintiffs' First Amended Complaint [filed May 1, 2015; docket #43], in which Defendant Walter Isenberg and Sage Oxford, Inc. joined, and Defendant Isenberg's Motion to Dismiss Plaintiffs' First Amended Complaint [filed June 30, 2015; docket #58], portions of which the Court converted to motions for summary judgment (*see infra*). Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1(c), the matters are referred to this Court for recommendation. After the exchange of limited preliminary discovery and the conversion to summary judgment, the motions are now fully briefed, and the Court concludes that oral argument would not materially assist in its adjudication of the motions.

**BACKGROUND**

I.     **Procedural History**

      Plaintiffs commenced this action on February 4, 2015 alleging essentially that Defendant

Sage Hospitality Resources ("SHR") violated Title III of the Americans with Disabilities Act ("Title III") by failing to provide wheelchair-accessible transportation services that are equivalent to the transportation services provided to nondisabled guests at SHR's hotels.  Complaint, docket #1.  SHR filed a motion to dismiss the Complaint on March 24, 2015, then filed a motion to stay proceedings pending resolution of the dispositive motion.  Dockets ## 23, 25.  On April 7, 2015, this Court heard the motion to stay and granted it in part to allow the Plaintiffs to engage in preliminary discovery to determine the proper defendant(s) against whom to bring this action.  Docket #28.

On April 14, 2015, the Plaintiffs filed the operative Amended Complaint against SHR, Sage Oxford, Inc. ("Sage Oxford") and Walter Isenberg ("Isenberg") alleging essentially the same facts and claim against all Defendants.  Docket #29.  After SHR filed the present motion to dismiss the Amended Complaint, this Court denied the original motion as moot.  Docket #45.  Then, on May 11, 2015, this Court held a Status Conference at which it granted Plaintiffs permission to take a deposition pursuant to Fed. R. Civ. P. 30(b)(6) and stayed both discovery and the Plaintiffs' response to the motion to dismiss pending completion of the deposition.  Docket #46.  During the course of a discovery dispute concerning the deposition, Sage Oxford filed a joinder in SHR's motion to dismiss and Isenberg filed his own (present) motion to dismiss the Amended Complaint on June 30, 2015.  Dockets ## 57, 58.  Thereafter, the Court granted the parties' requests for extensions of time to complete briefing for the present motions.  Dockets ## 68, 76, 79, 83, 95.

SHR and Sage Oxford contend that SHR does not own, operate, or lease the hotels identified in the Amended Complaint; Plaintiffs have no standing to bring nationwide class claims; Plaintiffs fail to allege a credible threat of immediate harm; and Plaintiffs have not pled a plausible basis for nationwide class relief.  Docket #43.  In turn, Isenberg argues he does not own, operate, or lease the

hotels identified in the Amended Complaint, and Plaintiffs' allegations are insufficient to state a plausible basis for individual liability under Title III.

Following a preliminary review of the parties' briefs opposing and supporting the motions, this Court determined that Defendants raised new arguments in their reply briefs concerning 42 U.S.C. §§ 12182(b)(2)(B) & (C). *See Home Design Servs., Inc. v. B&B Custom Homes, LLC*, 509 F. Supp. 2d 968, 971 (D. Colo. 2007) ("[R]eply briefs reply to arguments made in the response brief – they do not provide the moving party a new opportunity to present yet another issue for the court's consideration."). That is, the Defendants argued in their motions that they are "not owners, operators, or lessees of a public accommodation" pursuant to 42 U.S.C. § 12182(a), but they did not cite, nor even mention, §§ 12182(b)(2)(B) & (C) in the motions. *See* dockets ## 43 at 4-7, 58 at 5-9. Accordingly, the Court permitted the Plaintiffs to file sur-replies to address only the new arguments; Plaintiffs timely filed a single sur-reply on December 7, 2015. As explained below, the Court converted portions of the motions to motions for summary judgment, and the parties filed all final briefing on January 20, 2016.

## II.   Findings of Fact

The Court makes the following findings of fact for analysis pursuant to Fed. R. Civ. P. 56 viewed in the light most favorable to the Plaintiffs, who are the non-moving parties in this matter.

1.   The stated general purposes of SHR, as recited in its Limited Liability Company Agreement, are:

> to engage in activities related to the hospitality industry, including but not limited to the development, acquisition and operation of hotel assets, brokerage and consulting services relating to such activities, and any other activities in which a limited liability company formed under the Act may engage. Any of the foregoing may be conducted directly by the Company or indirectly through another company, joint venture or other arrangement.

Docket #90-7 at 10.

2.      Defendant Isenberg is the President and CEO of SHR.  Rule 30(b)(6) Deposition of Harris White, September 3, 2015 ("White Depo"), 163: 13-15.

3.      According to SHR's website, http://www.sagehospitality.com, it is "a respected and successful hotel operator and investor" and is "one of the largest hotel management companies in the US. Our hotel portfolio ranges from large, urban, full-service hotels to select-service suburban properties," which includes the subject hotels in this action, The Oxford Hotel and TownePlace Suites by Marriott Boulder Broomfield. *See* SHR Website Pages, January 15, 2016, dockets ##111-1, 111-2, and 111-3.

4.      Paul McCormick and Vincent Piro, both SHR's Division Vice Presidents of Operations, Premier and Lifestyle, are "responsible for all day to day operations of the hotels with an emphasis on staff training, service delivery, expense control and financial performance."  Dockets ##111-4 and 111-5. The Oxford Hotel is listed as one of SHR's "Premier & Lifestyle" hotels on its website. Docket #111-2 at 3.

5.      Jan Lucas, SHR's Regional Vice President, Premium Branded Division, is "responsible for all aspects of support and performance for hotels which includes Premium Branded Select Service and Full Service properties and several independent boutique hotels." Docket #111-6.  TownePlace Suites by Marriott Boulder Broomfield is listed as a "Select Service" hotel on SHR's website.

6.      As of April 30, 2015, Fred Kleisner was employed by Sage Oxford and was the General Manager of The Oxford Hotel located at 1600 17th Street, Denver, CO 80202.  Declaration of Fred Kleisner, April 30, 2015, docket #43-1.  Mr. Kleisner has personal knowledge that SHR does not lease the Oxford Hotel property.  *Id.*

7.      Mr. Kleisner reports to Mr. McCormick.  White Depo, 46: 11-20.

8.      Isenberg is a director and holds the office of President of Sage Oxford.  According to Sage Oxford's bylaws, the President "shall be the principal executive officer of the corporation and, subject to the control of the directors, shall, in general, supervise and control all of the business and affairs of the corporation."  Docket #90-9 at 7.

9.      An entry from the website, https://www.sec.gov/Archives/edgar/data, dated June 22, 2015, provides information concerning "Mortgage Loan No. 8 - Millenium Financial Center," which originated on May 2, 2006 by or on behalf of Principal Commercial Funding II, LLC for a property managed by Sage Oxford, Inc.  Docket #89-2.  The entry provides the following information:

> PROPERTY MANAGEMENT. The Millennium Financial Center Property is managed by Sage Oxford, Inc. which is an affiliate of the Millennium Financial Center Borrower. The management agreement is subordinate to the Millenium Financial Center Loan. Walter Isenberg is the co-founder of Sage Hospitality Resources and serves as the company's President and CEO. Sage Oxford, Inc., an affiliate of Sage Hospitality Resources[,] manages and leases the Millennium Financial Center Property. Sage Oxford, Inc. specializes in the operations, development, and capital transactions of hospitality real estate. Sage Oxford, Inc. owns and operates 44 hotels in 19 states, ranging from large, urban full-service hotels to smaller, limited-service suburban properties. Mr. Isenberg directs all company operations, including hotel development, asset management, and property management. Sage Oxford, Inc. has been managing the property since it was built in 2000.

*Id.*

10.     A March 20, 2015 search result on the website http://www.denvergov.org/Property reveals information from the Denver Property Assessment and Taxation System and lists Oxford 2005 LLLP ("Oxford 2005") as the owner of the property at 1600 17th Street.  Docket #43-8 at 2.

11.     Oxford 2005 is a partner of Cornerstone Oxford Company, Inc. ("Cornerstone") and the sole member of Oxford 2005 Holdings LLC ("Oxford Holdings").  Docket #91-11.  As of March 6, 2007,

Isenberg was the President of Cornerstone.  *Id.*

12.     On August 1, 2012, representatives from Alamo Leasing Company, Inc. ("Alamo") and Oxford Holdings executed a "Schedule A" to a Master Lease Agreement, in which Alamo agreed to lease to Oxford Holdings a 2013 Cadillac Escalade for use at The Oxford Hotel.  Docket #43-3 at 2.

13.     A "Business-Professional License" was issued by the City and County of Denver on April 9, 2014 (expired April 29, 2015) to "McCormick & Schmick Rest & Oxford 2005 Holdings" for McCormick's Fish House & Bar and The Oxford Hotel at 1600 17th Street, Denver, CO.  Docket #43-10 at 2.

14.     As of April 30, 2015, Sam Karabel was employed by Sage TPS, LLC and was the General Manager of Townplace Suites Broomfield located at 480 Flatiron Boulevard, Broomfield, CO 80021.  Declaration of Sam Karabel, April 30, 2015, docket #43-4.  Mr. Karabel has personal knowledge that SHR does not lease the Townplace Suites Broomfield  property.  *Id.*

15.     A 2015 Management Agreement for Towneplace Suites Boulder Broomfield, which is "by and between" BRE Avalanche Property Owner LLC as "Owner" of the property at 480 Flatiron Blvd.  and Sage TPS, LLC as "Manager," reflects that "Owner desires to turn over to Manager the operation, direction, management and supervision of the Hotel, and Manager desires to assume all such responsibilities as agent for and on the account of Owner upon the terms and subject to the conditions set forth in this Agreement."  Docket #90-6 at 6.

16.     Sage TPS is a 100% subsidiary of SHR. White Depo: 128: 8-9. "Sage Hospitality Resources has the management agreement through its wholly owned subsidiary, Sage TPS, LLC, for the provision of the services that are outlined in the agreement." *Id.*, 128: 2-5.

17.     Sage TPS specified SHR as a named insured pursuant to the Management Agreement because "Sage Hospitality Resources is a hundred-percent owner of the membership interest of Sage TPS, LLC." *Id.*, 134: 9-21; docket #90-6 at 32.  In addition, the Agreement provides that Sage TPS may assign its rights and obligations under the Agreement without the Owner's consent to certain specified entities "so long as no such assignment or transfer ... results in a Change in Control of [Sage TPS] or Sage Hospitality Resources, LLC."  Docket #90-6 at 41.  Finally, the Agreement provides for "group services" by SHR that are provided "to all of [SHR's] operated hotels," including payroll, conferences and training.  *Id.* at 58.

18.     Sage Management Services, Inc. ("SMS") is the manager of Sage TPS and "most of [SHR's] LLC entities."  White Depo, 10: 11-17.

19.     Isenberg is a director and holds the office of President of SMS.  Docket #90-12.  According to SMS's bylaws,[1] the President "shall be the principal executive officer of the corporation and, subject to the control of the directors, shall, in general, supervise and control all of the business and affairs of the corporation."  Docket #90-11 at 7.

20.     A March 20, 2015 search result on the website http://gis.broomfield.org/apps/ParcelSearch reveals information from a Broomfield Parcel Report for 480 Flatiron Blvd. and lists TPS Broom LLC as the owner of the property at 480 Flatiron Blvd.  Docket #43-9 at 2.

21.     A "Lodging Tax License" was issued on August 21, 2012 and a "Sales Tax License" was issued on August 28, 2012 by the City and County of Broomfield to "TPS Broom LLC" for TownePlace Suites Broomfield at 480 Flatiron Blvd., Broomfield, CO.  Docket #43-11 at 2, 4.

---

[1]"So Mr. Isenberg, as president of Sage Management Services, Inc., his duties would be outlined in the bylaws of Sage Lano, Inc., which was the predecessor to Sage Management Services, Inc."  White Depo, 151: 5-8.

22.     On March 23, 2011, representatives from Alamo Leasing Company, Inc. ("Alamo") and JER ES Broom, LLC ("Broom") executed a "Schedule A" to a Motor Vehicle Master Closed End Lease Agreement, in which Alamo agreed to lease to Broom a 2011 Ford E150 Club Wagon XLT for use at Townplace Suites - Boulder Broomfield.  Docket #43-6 at 2.

23.     However, on August 28, 2013, Broom filed with the Colorado Secretary of State a "Statement of Foreign Entity Withdrawal" asserting it "will no longer transact business or conduct activities in Colorado and relinquishes its authority to transact business or conduct activities in Colorado."  Docket #90-2 at 2-3.

## III.    Statement of Other Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by the Plaintiffs in the operative Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(1) pursuant to *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) and under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff Margaret Denny ("Denny") is a member of Plaintiff Civil Rights Education and Enforcement Center ("CREEC") and is and has been at all relevant times a resident of the State of Colorado. Among other impairments, Denny has chronic pain and uses a motorized wheelchair for mobility. She has a disability within the meaning of the ADA, 42 U.S.C. § 12102. Because Denny requires a wheelchair-accessible vehicle in order to utilize transportation services offered by hotels, she has a personal interest in ensuring that hotels comply with federal requirements governing provision of accessible transportation services to hotel guests. She is also a tester in this litigation.

SHR is a hotel management, investment, and development company incorporated in

8

Delaware, with its principal place of business at 1575 Welton Street, Suite 300, Denver, Colorado. According to its website, SHR owns and/or operates more than 75 hotels throughout the United States, including approximately 22 hotels in the State of Colorado, and "manages 18 hotels in the Denver Metro area, giving one-stop shopping with a distinctive mix of hotel brands and types to satisfy any needs and budget." Among the 18 hotels that Sage Hospitality claims to manage are The Oxford Hotel and the TownePlace Suites by Marriott Boulder Broomfield ("TPS").

TPS is located in Broomfield, CO, and provides its guests with a local shuttle service within a five-mile radius of the hotel.  On or about October 16, 2014, Denny telephoned TPS and asked whether it provided wheelchair-accessible shuttle services. A TPS representative informed her that the hotel does not offer wheelchair-accessible shuttle services.  If the hotel had provided wheelchair-accessible shuttle services, Denny intended to stay there and to use those services. She was deterred from doing so by the hotel's lack of wheelchair-accessible shuttle services.

Denny would like to stay at the TPS in the future and use the hotel's transportation services, and will do so if she is informed that such accessible services exist. She is currently deterred from doing so by the hotel's lack of wheelchair-accessible shuttle services.  Thus, Denny will continue to test this TPS and other covered hotels by calling several times per year to see whether wheelchair-accessible shuttle services are available.

The Oxford Hotel located in Denver, CO ("The Oxford") provides its guests with a local shuttle service within a two-mile radius of the hotel.  On or about October 16, 2014, Denny telephoned The Oxford and asked whether it provided wheelchair-accessible shuttle services. A hotel representative informed her that The Oxford does not offer wheelchair-accessible shuttle services.  If the hotel had provided wheelchair-accessible shuttle services, Denny intended to stay

there and to use those services. She was deterred from doing so by the hotel's lack of wheelchair-accessible shuttle services.

Denny would like to stay at The Oxford in the future and use the hotel's transportation services, and will do so if she is informed that such accessible services exist. She is currently deterred from doing so by the hotel's lack of wheelchair-accessible shuttle services. Thus, Denny will continue to test The Oxford and other covered hotels by calling several times per year to see whether wheelchair-accessible shuttle services are available.

On information and belief, Defendants own, lease (or lease to) and/or operate a number of other hotels in the United States that offer transportation services to their guests but do not offer equivalent transportation services to guests who use wheelchairs or scooters. For example, prior to the initiation of this lawsuit, Ms. Corbett O'Toole, a member of CREEC who uses a wheelchair for mobility, called the following hotels, all of which purport to offer transportation to their guests. During the calls, Ms. O'Toole confirmed that each hotel offered transportation services to its guests and asked whether the hotel provided accessible transportation services, but none of them did:

> Fairfield Inn & Suites Indianapolis Airport, 5220 W Southern Ave., Indianapolis, IN
> Courtyard Grand Rapids Airport, 4741 28th St. SE, Grand Rapids, MI
> Minneapolis Marriott Southwest, 5801 Opus Pkwy., Minnetonka, MN
> Courtyard Charlotte Airport, 2700 Little Rock Rd., Charlotte, NC
> Element Ewing Princeton, 1000 Sam Weinroth Rd. E, Ewing, NJ
> Fairfield Inn Las Vegas Airport, 3850 S. Paradise Rd., Las Vegas, NV
> Hampton Inn Long Island – Brookhaven, 2000 N Ocean Ave., Farmingville, NY
> Courtyard Cleveland Beachwood, 3695 Orange Pl., Beachwood, OH
> Courtyard Dallas Addison/Midway, 4165 Proton Dr., Addison, TX

Ms. O'Toole also called the Homewood Suites by Hilton San Francisco Airport - North, 2000 Shoreline Ct., Brisbane, CA. This hotel provides transportation services to its guests without any advance notice requirement. When Ms. O'Toole asked if the hotel provided accessible transportation

services, she was told that guests requiring accessible transportation would need to notify the hotel 24 hours in advance of the time that the guest needed the accessible transportation.

On information and belief, after August 25, 1990, Defendants have purchased or leased vehicles for use on fixed-route and/or demand-responsive transportation systems in place at their hotels.

CREEC brings this action based on associational standing on behalf of its members. CREEC's members – including Denny – include persons with disabilities who use wheelchairs or scooters for mobility, who would like to stay at Defendants' hotels and use their transportation services, but have been deterred and prevented from doing so by the failure of those hotels to provide equivalent, wheelchair-accessible transportation services. Because CREEC seeks only declaratory and injunctive relief, individual participation of CREEC members is not required.

## **LEGAL STANDARDS**

### I.     **Conversion from Fed. R. Civ. P. 12(b)(1) to Fed. R. Civ. P. 56**

Defendants originally filed the present motions pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*, 495 F.2d 906,

909 (10th Cir. 1974).  A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere [conclusory] allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *See Basso*, 495 F.2d at 909.

Here, the Plaintiffs challenged whether Defendants' motions to dismiss for lack of subject matter jurisdiction should be converted to motions for summary judgment, since "the jurisdictional question is intertwined with the merits of the case" where jurisdiction is dependent on the same statute that provides the substantive claim in the case.  Defendants countered that the evidence they supplied with their motions constitutes either matters of public record or information incorporated by reference in the operative pleading and, thus, need not serve as a basis to convert the motions.  The Court disagreed with Defendants, at least as to their primary jurisdictional argument, and found the jurisdictional claim and merits of this case sufficiently "intertwined."  *See* docket #110; *see also Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 978 (10th Cir. 2002) (district court properly converted motion to dismiss to one for summary judgment where jurisdictional question involved whether defendant was an "employer" under the ADA and defendant attached payroll records and an affidavit).  In support of their argument that SHR and Isenberg do not own, operate, or lease the subject hotels or vehicles, Defendants cite to the declarations of the hotels' general managers, which provide the managers' "personal knowledge" regarding whether the hotel properties are leased by SHR.  Dockets ##43-1, 43-4.  Such declarations are neither "matters of public record" nor "information incorporated by reference in the operative pleading."  To the extent the Defendants intend that the Court rely on such information, the Court determined that the portions of the motions asserting such arguments must be converted to Rule 56.

## II.     Dismissal under Fed. R. Civ. P. 56

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation

omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## III.   Dismissal under Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that

14

they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.,* 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## ANALYSIS

### I.      Jurisdictional Defenses

Defendants SHR and Isenberg contend the Plaintiffs do not have standing to bring Title III claims against them because these Defendants do not own, lease, or operate the subject hotels, The

Oxford and TPS and, thus, Plaintiffs fail to establish that a judgment against SHR and Isenberg would redress their injuries. SHR asserts that Plaintiffs' allegations to the contrary are insufficient and contradictory, particularly where documentation establishes who actually operates these hotels. Further, Defendants state that Plaintiffs have failed to plead an intent to return to the hotels and, thus, fail to show real and imminent injury. Finally, Defendants argue the Plaintiffs lack standing to seek injunctive relief as to any hotels other than The Oxford and TPS.

Plaintiffs counter that SHR and Isenberg were named as Defendants based on their own representations on websites and public documents that they own and/or operate the subject hotels. In addition, SHR's Rule 30(b)(6) witness testified that SHR's website lists hotels it "operates through its subsidiaries." Plaintiffs also state that SHR's role as an "operator" is confirmed by evidence that it controls these hotels' managers and owners. Plaintiffs conclude that Defendants' other standing arguments are contrary to Tenth Circuit precedent.

Defendants reply first that Plaintiffs impermissibly add allegations in their response brief, and next that their motions need not be converted to motions under Rules 12(b)(6) or 56 based on the attached documents. After repeating certain other arguments made in the motions, Defendants also argue that Plaintiffs fail to meet the standards for standing in 42 U.S.C. §§ 12182(b)(2)(B) & (C). The Court determined this latter argument to be "new" and permitted Plaintiffs to file a surreply.

For their surreply, Plaintiffs contend the Defendants rely on the incorrect definition of "operate" for application of §§ 12182(b)(2)(B) & (C) to the facts of this case. In addition, Plaintiffs assert that the Department of Justice has explicitly incorporated the transportation regulations and extended their coverage to any entity that owns, operates, or leases to a place of public

accommodation. As set forth above, this Court determined on December 28, 2015 that Defendant's proffer of personal affidavits in support of its lack of standing argument required conversion of the motion to dismiss into a motion for summary judgment.

Standing is an essential component of the case-or-controversy requirement of Article III of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has the burden of establishing standing in order to invoke the jurisdiction of the federal courts. *Id.* at 561. To establish Article III standing, a plaintiff must allege that 1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). Moreover, a claim for a future injury constitutes mere speculation or conjecture and does not warrant invocation of jurisdiction. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *see also L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (holding, "The speculative nature of [Plaintiff's] claim of future injury requires a finding that this prerequisite of equitable relief has not been fulfilled.").

A.    Are SHR and Isenberg Proper Defendants?[2]

Defendants SHR and Isenberg first assert they do not own, lease, or operate the subject hotels as defined by Title III of the ADA, 42 U.S.C. § 12181, *et seq.* Title III of the ADA prohibits discrimination against persons with disabilities in places of public accommodation. 42 U.S.C. § 12182(a). Section 12182(a) provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages,

---

[2]As set forth above, the Court will analyze this issue pursuant to Fed. R. Civ. P. 56.

or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *Id.* § 12182(a); *see also Colo. Cross Disability Coalition v. Hermanson Family Ltd. P'ship*, 264 F.3d 999, 1002 (10th Cir. 2001).  The Act also "provides a private right of action for preventative relief, including an application for a permanent or temporary injunction or restraining order for 'any person who is being subjected to discrimination on the basis of disability in violation of' Title III." *Hermanson Family*, 264 F.3d at 1001-02 (quoting §§ 12182(a)(1), 2000a-3(a)).

No party disputes that Plaintiffs' claim arises under 42 U.S.C. §12182(b)(2)(B), which governs the conduct of private entities that offer public transportation via a "fixed route system," and 42 U.S.C. § 12182(b)(2)(C), which governs the conduct of private entities that offer public transportation via a "demand responsive system."  Specifically, these sections provide:

(B) Fixed route system

(i) Accessibility

It shall be considered discrimination for a private entity which operates a fixed route system and which is not subject to section 12184 of this title to purchase or lease a vehicle with a seating capacity in excess of 16 passengers (including the driver) for use on such system, for which a solicitation is made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

(ii) Equivalent service

If a private entity which operates a fixed route system and which is not subject to section 12184 of this title purchases or leases a vehicle with a seating capacity of 16 passengers or less (including the driver) for use on such system after the effective date of this subparagraph that is not readily accessible to or usable by individuals with disabilities, it shall be considered discrimination for such entity to fail to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities.

18

(C) Demand responsive system

For purposes of subsection (a) of this section, discrimination includes –

(i) a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities; and

(ii) the purchase or lease by such entity for use on such system of a vehicle with a seating capacity in excess of 16 passengers (including the driver), for which solicitations are made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities (including individuals who use wheelchairs) unless such entity can demonstrate that such system, when viewed in its entirety, provides a level of service to individuals with disabilities equivalent to that provided to individuals without disabilities.

*Id.* In other words, for all purchases or leases after August 25, 1990 for a fixed route system, vehicles with a seating capacity over 16 passengers must be wheelchair-accessible and vehicles with a seating capacity of less than 16 passengers must be either wheelchair-accessible or equivalent service must be provided. In addition, a demand responsive system must operate such that its service is equally accessible to both disabled and non-disabled passengers.

In their motions, SHR and Isenberg contend they are not subject to Title III of the ADA at all because they do not own, lease, or operate The Oxford or TPS, as demonstrated by the attached affidavits, management agreements and vehicle lease agreements. Plaintiffs counter that the evidence demonstrates an issue of fact as to whether SHR and Isenberg "operate" the hotels. In reply, SHR and Isenberg argue "the 'own, lease, or operate' standard does not apply to subsections 12182(b)(2)(B) & (C) as it does the general prohibition against discrimination." Reply, docket #102 at 4. Plaintiffs respond that SHR and Isenberg use the incorrect definition of "operate" in support of their arguments and ignore the Department of Justice's incorporation and extension of the

transportation regulations to "any entity that owns, operates, leases or leases to a place of public accommodation."  Surreply, docket #109 at 4.

SHR and Isenberg argue first that to demonstrate discrimination pursuant to subsections 12182(b)(2)(B)(i) & (C)(ii), a named defendant must be the "purchaser" or "lessor" of a vehicle intended for use in a fixed route system.  Logically, then, the term "private entity" in these sections must have a different meaning than "a place of public accommodation" identified in Section 12182(a).  They assert that the specific subsections 12182(b)(2)(B) & (C) control over the "conflicting" general discrimination provision.  However, SHR and Isenberg fail to explain how these provisions conflict with one another.  *See Nitro-Lift Techs., LLC v. Howard*, -- U.S. --, 133 S. Ct. 500, 504 (2012) ("the ancient interpretive principle that the specific governs the general ... applies only to **conflict** between laws of equivalent dignity.") (emphasis added); *see also Shawnee Tribe v. U.S.*, 423 F.3d 1204, 1213 (10th Cir. 2005) ("It is a 'fundamental canon of statutory construction that, when there is an apparent conflict between a specific provision and a more general one, the more specific one governs.'") (citation omitted).

In fact, subsection 12182(b)(2)(C) specifically identifies what constitutes discrimination "for purposes of" section 12182(a).  By referencing section 12182(a) without limitation at the outset, subsection 12182(b)(2)(C) incorporates the entirety of the provision, including "any person who owns, leases (or leases to), or operates a place of public accommodation."  Further, it would be incongruent to interpret the term, "private entity," in subsection 12182(b)(2)(B)(i) & (C)(ii) differently than that in subsection 12182(b)(2)(B)(ii) & (C)(i) except, of course, for the obvious difference in the type of transportation systems these entities operate.  Finally, the statute itself defines places of accommodation as follows:

(7) Public accommodation

The following ***private entities*** are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce--

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor; ...

42 U.S.C. § 12181(7)(A) (emphasis added). Consequently, the Court finds the term, "private entity" consistent with, and not distinct from "a place of public accommodation" identified in Section 12182(a). Thus, a properly named defendant alleged to have discriminated against a plaintiff in violation of these provisions would be an owner, lessor, lessee, or operator of the "private entity" identified in subsections 12182(b)(2)(B) & (C).

Plaintiffs also cite to the regulations accompanying the statute, saying the Department of Justice, which is responsible for implementing the statutory requirements of Title III, has explicitly incorporated the Department of Transportation "Accessible" Regulations. *See* 28 C.F.R. § 36.310. One such regulation defines "operate" to "include[], with respect to a fixed route or demand responsive system, the provision of transportation service by a public or private entity itself or by a person under a contractual or other arrangement or relationship with the entity." 49 C.F.R. § 37.3. The regulations also provide:

Shuttle systems and other transportation services operated by privately-owned hotels, car rental agencies, historical or theme parks, and other public accommodations are subject to the requirements of this part for private entities not primarily engaged in the business of transporting people. Either the requirements for demand responsive or fixed route service may apply, depending upon the characteristics of each individual system of transportation.

49 C.F.R. §37.37(b). Accordingly, Plaintiffs argue, and the Court agrees, a defendant is governed by these regulations if it has a contractual or other arrangement or relationship with the place of

public accommodation and is, thus, an "operator" of the place in accordance with 42 U.S.C. § 12182(a) and pursuant to Department of Transportation regulations.

In light of this finding and the undisputed facts that The Oxford and TPS are private entities and places of public accommodation that provide transportation services via fixed route or demand responsive systems, the Court must next determine whether there exist genuine issues of material fact as to whether SHR and Isenberg are owners, lessors, lessees, or operators of the hotels.  For purposes of the present motions, it appears the Plaintiffs do not assert that SHR and Isenberg are "owners," "lessors," or "lessees" of the subject hotels; thus, the Court will examine whether the evidence demonstrates genuine issues as to whether SHR and/or Isenberg "operate" the hotels.

Title III of the ADA itself does not define the terms  "owns, leases or operates"; thus, courts have followed the Fifth Circuit's opinion in *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995), *cert. denied*, 516 U.S.1045, 116 S.Ct. 704 (1996), and looked at the ordinary meaning of the terms to determine the amount of control required to trigger the ADA's requirements. In concluding that a franchisor was not an operator under the ADA, the *Neff* court relied on commonly understood definitions of operate:

> Because the ADA does not define the term "operates" we "construe it within its ordinary and natural meaning." *Smith v. United States*, [508 U.S. 223,] 113 S. Ct. 2050, 2054 (1993).... To "operate," in the context of a business operation, means to put or keep in operation," The Random House College Dictionary 931 (Rev. ed. 1980), "[t]o control or direct the functioning of," Webster's II: New Riverside University Dictionary 823 (1988), "[t]o conduct the affairs of; manage," The American Heritage Dictionary 1268 (3d ed. 1992).

*Id.* at 1066; *see also Emerson v. Thiel College* , 296 F.3d 184, 189 (3d Cir. 2002); *Dalhberg v. Avis Rent a Car Sys., Inc.*, 92 F. Supp. 2d 1091, 1102 (D. Colo. 2000).

Notably, the court in *Neff* specified that "the relevant question in this case is whether [the

defendant], according to the terms of its franchise agreements ..., controls modification of the [places of public accommodation] to cause them to comply with the ADA." *Neff*, 58 F.3d at 1067; *see also Colon v. League of United Latin Am. Citizens*, 91 F.3d 140, (5th Cir. 1996) ("To be an 'operator' requires more than simply controlling some aspect of a public accommodation. Rather, the person must have control over the modification sought by the plaintiff."); *Dahlberg*, 92 F. Supp. 2d at 1102.

Here, the modification sought is the accessibility of the hotels' transportation vehicles. The Court finds the evidence reflects genuine issues as to whether SHR controls The Oxford and TPS to cause them to bring the hotels' vehicles into compliance with Title III. The stated general purposes of SHR, as recited in its Limited Liability Company Agreement, are:

> to engage in activities related to the hospitality industry, including but not limited to the development, acquisition and operation of hotel assets, brokerage and consulting services relating to such activities, and any other activities in which a limited liability company formed under the Act may engage. Any of the foregoing may be conducted directly by the Company or indirectly through another company, joint venture or other arrangement.

Here, there is no dispute that hotel transportation is an "activity related to the hospitality industry" and SHR purposes to acquire and operate hotel assets, which could include vehicles in this sense, relating to such activity. While SHR argues it is not (and has not been) the entity involved in acquiring and owning the hotels' vehicles, the question in this case is whether it has control sufficient to direct that such vehicles comply with the ADA. The Court finds a reasonable juror could conclude it does, particularly where two of its Division Vice Presidents are "responsible for all day to day operations of the hotels [including The Oxford] with an emphasis on staff training, **service delivery**, expense control and financial performance," and where a Regional Vice President is "responsible for **all aspects of support and performance** for hotels which includes Premium Branded Select Service and Full Service properties [including TPS] and several independent

23

boutique hotels" (emphasis added).

With respect to Isenberg, Defendants argue "Title III of the ADA does not impose personal liability for managers and shareholders of entities operating places of public accommodation." Motion, docket #58 at 7.  Citing case law outside of this Circuit, Defendants contend that the "Plaintiffs are not alleging specific acts or orders from Mr. Isenberg, but instead, challeng[ing] the Oxford's and TPS' institutional policies involving guest transportation services."  Reply, docket #101 at 10.  Plaintiffs counter that "numerous courts," including one in this District, have found individual liability for Title III violations proper where "an individual exerts significant control over a small company."  Response, docket #91 at 10.

The Tenth Circuit Court of Appeals has neither ruled, nor commented, on whether a defendant may be held individually liable under Title III of the ADA.  Accordingly, I must attempt to ascertain how the Tenth Circuit would rule if faced with the issue before the Court here.

In 1997, the Honorable John L. Kane in this District found that "[n]early every court that has decided the issue has found that individuals can be held responsible for violations of Title III 'if they "own, lease[ ] (or lease[ ] to) or operate[ ]" a place of public accommodation.'" *Howard v. Cherry Hills Cutters, Inc.*, 979 F. Supp. 1307, 1309 (D. Colo. 1997) (citing *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 322 (D. Mass. 1997) (this interpretation "'retains accountability for those in a position to ensure nondiscrimination.'")).  In *Howard*, Judge Kane found the allegations were insufficient to impose liability on the individual defendant, who was characterized as an "employee" of the company.  *Id.*[3]

---

[3]For purposes of this analysis, the Court notes that *Howard* has been cited in two unpublished decisions and no published decisions.

If this Court were to follow *Howard*'s reasoning, it could find genuine issues as to individual liability against Isenberg, particularly considering he is likely "in a position to ensure nondiscrimination" at the hotels.  However, courts since 1997 have been reluctant to simply "impose personal liability" on individual defendants under Title III, particularly considering that individual liability is not proper under other titles of the ADA nor under similar civil rights statutes, such as Title VII: "It is difficult to believe that Congress intended to impose personal liability upon every person that has made a decision regarding [the policy at issue]."  *Coddington v. Adelphi Univ.*, 45 F. Supp. 2d 211, 217 (E.D. N.Y. 1999) ("Congress has evidenced an intent to exclude individual liability.").  In fact, after analyzing cases across the country addressing the issue, the court in *Coddington* concluded:

> The common thread running through these cases is the search for identification of the proper defendant. Merely holding that an individual is the proper defendant in an ADA public accommodations lawsuit, however, is not tantamount to holding that there is personal liability. It stands merely for the proposition that an individual may be the proper entity to name as a defendant in a particular lawsuit.

*Id.* 216.  Based on this conclusion, the court found "[w]here ... plaintiff seeks relief based upon discrimination allegedly practiced by an educational institution, it is the institution that has the power to make any accommodations required by law. Therefore, it is the institution that operates the place of public accommodation and is, thus, the proper defendant."  *Id.* at 217.  Importantly, as pertains here, the *Coddington* court also held:

> The court declines to impose personal liability even if the cooperation of the Individual Defendants [including university trustees and former and acting presidents] is necessary to ensure compliance with the ADA and the Rehabilitation Act. As employees of the University, the individuals named herein may be called upon to implement any order entered against the University with regard to the plaintiff's needs. It is the view of the court, however, that this should not work to subject these or any other individuals to personal liability.

*Id.* No court in the Tenth Circuit has followed *Coddington*; however, recent decisions indicate there is a split in the circuit courts as to whether individual liability may be imposed under Title III.[4]

Importantly, the cases finding no individual liability under Title III involve allegations of discriminatory acts taken pursuant to an institutional policy. In this case, although they do not use the term, "policy," the Plaintiffs, a purported class of disabled individuals, allege:

> Defendants have engaged in illegal disability discrimination, as defined by Title III, including without limitation, by failing to ensure that transportation vehicles in use at their hotels are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, by failing to ensure that their hotels provide equivalent accessible transportation services to such individuals, and/or by failing to ensure that personnel are trained to proficiency with respect to the provision of accessible transportation services.

First Amended Complaint, ¶ 54, docket #29. In addition, they seek only declaratory and injunctive relief in this action. *Id.* at 13. At least one district court has found that declining to impose individual liability under such circumstances to be "eminently reasonable." *Steere v. George Wash. Univ.*, 368 F. Supp. 2d 52 (D.D.C. 2005) (where plaintiff sought only injunctive relief, the court held where "the institution, not the individuals, has the power to accommodate, only an injunction directed at the institution will provide the relief sought.") (citing *Coddington*, 45 F. Supp. 2d at 217). Considering the lack of individual liability imposed for other titles of the ADA, as well as in similar civil rights statutes, the Court finds it likely that the Tenth Circuit would find individual liability improper in this case.

---

[4]*Compare Emerson v. Thiel College*, 296 F. 3d 184, 189 n.3 (3d Cir. 2002) (finding no liability against the individual defendants [including the former president] citing *Coddington* and finding "the institution ... operates the place of public accommodation and is the proper defendant.") *with Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 849 (9th Cir. 2004) (finding the Director of Center Sales and Event Services "had the requisite authority to qualify as an 'operator' under Title III."). Notably, the *Lentini* court also found the factual findings indicated the director "actively participated in the discriminatory acts." *Id.*

Even if the Tenth Circuit found individual liability proper under Title III, the Court finds it would be improper against Isenberg in this case.  At the district level, courts finding that individual liability may be imposed focus on whether the factual allegations (for a Rule 12(b)(6) analysis) or the factual evidence (for a Rule 56 analysis) demonstrate the individual defendant is an "owner, lessor, lessee, or operator" of the place of public accommodation.[5]  The majority of decisions finding individual liability focus not only on the defendant's control over the operations of the place of accommodation, but also on the defendant's ability to perform and remedy the alleged discriminatory conduct.  *See, e.g., Clement*, 927 F. Supp. 2d at 318; *see also Bowen v. Rubin*, 385 F. Supp. 2d 168, 181 (E.D. N.Y. 2005) (individual defendant was the **sole shareholder** and president of the entity defendants); *United States v. Morvant*, 843 F. Supp. 1092 (E.D. La. 1994) (finding individual defendant dentist liable under Title III despite operating his practice as a corporation since he was the **sole owner, director, and president of the corporation** and was charged directly with refusing treatment in violation of the ADA).

Isenberg is not only the President and CEO of SHR, but he also is a Director and the President of Sage Oxford, which manages The Oxford, and a Director and the President of SMS, which manages Sage TPS, LLC, which, in turn, manages TPS.  The bylaws of both Sage Oxford and SMS specify that the President "shall be the principal executive officer of the corporation and, **subject to the control of the directors**, shall, in general, supervise and control all of the business

---

[5]*See, e.g., Bebry v. ALJAC LLC*, 954 F. Supp. 2d 173, 178 (E.D. N.Y. 2013) (complaint's allegations were insufficient to show a CEO of the company that owned the place of public accommodation "was in a position of authority or had power and discretion to perform potentially discriminatory acts."); *see also Clement v. Satterfield*, 927 F. Supp. 2d 297, 318 (W.D. Va. 2013) (court denied summary judgment in favor of individual defendant who was delegated the "unfettered responsibility" to administer the challenged application process).

and affairs of the corporation" (emphasis added).  Thus, unlike the defendants in *Clement, Bowen* and *Morvant*, who had sole control over the alleged discriminatory acts, Isenberg's acts are subject to the control of the company's directors.  Plaintiffs argue that, as Isenberg is both director and President, there is an inherent conflict as to how Isenberg is governed; however, it is undisputed that other individuals serve as directors of the companies and there is no evidence that Isenberg has acted outside of their control.  Plaintiffs also argue that the directors have failed to follow certain bylaws, such as failing to hold annual meetings, and, in so doing, have essentially rendered the bylaws ineffectual.  But again, as there is no indication that Isenberg has acted on his own, outside of the authority granted him by the directors of the companies, there is no basis on which to find Isenberg has the sole control over the ability to not only operate the hotels, but also to perform and remedy the hotels' vehicle inaccessibility.  Accordingly, no reasonable juror could conclude that Isenberg himself has the control sufficient to direct that the hotels' vehicles comply with the ADA.

Therefore, the Court respectfully recommends that the District Court **grant in part** Isenberg's motion, finding it improper to impose individual liability against Isenberg under the circumstances of this case, and **deny in part** the motion to the extent Isenberg joins in SHR's motion.  In addition, the Court recommends that the District Court **deny** SHR's motion finding that genuine issues of material fact exist as to whether SHR is a proper Defendant in this case.

B.      Do Plaintiffs Lack Standing to Assert Injunctive Relief?

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint.  In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.

Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1002-03 (citations omitted). This portion of the present motions launches a facial attack on this Court's subject matter jurisdiction; therefore, the Court will accept the truthfulness of the Complaint's factual allegations.

In the First Amended Complaint ("FAC"), the Plaintiffs seek the following relief:

1.   A declaration that Defendants' conduct as alleged here has violated, and continues to violate, Title III of the Americans with Disabilities Act of 1990, as well as its implementing regulations;

2.   Issuance of a permanent injunction requiring Defendants to comply with the ADA in hotels that they currently, or in the future, own, lease (or lease to) or operate;

3.   Award of Plaintiffs' reasonable attorneys' fees and costs, as provided by law; and

4.   Such other additional or alternative relief as the Court finds just and proper.

Docket #29 at 13. Defendants argue the Plaintiffs lack standing to assert injunctive relief against hotels Denny has never contacted, and the Plaintiffs have failed to plead an intent to return to the contacted hotels, which is necessary to demonstrate a real, imminent injury.

As set forth above, a plaintiff has the burden of establishing standing in order to invoke the jurisdiction of the federal courts, and to establish Article III standing, a plaintiff must allege that 1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be

redressed by the relief requested.  The Court will analyze Defendants' arguments pursuant to Fed. R. Civ. P. 12(b)(1).

First, Defendants contend that for a Title III claim, a plaintiff must "prove knowledge of the barriers and that they would visit the hotel in the imminent future but for those barriers."  Motion, docket #43 at 7.  They assert that, because Plaintiffs' allegations reflect Denny contacted only the Oxford and TPS, and another individual contacted other hotels under SHR's portfolio, Denny has no knowledge of barriers at and, thus, does not have standing to seek injunctive relief against, any hotels other than The Oxford and TPS.  In addition, Defendants assert that because Denny has no standing in this regard, CREEC has no associational standing to seek the same injunctive relief.

Plaintiffs counter that Denny "does not claim personal standing to challenge such barriers, nor does she seek an injunction on her own behalf."  Response, docket #90 at 15.  Rather, Denny "seeks a nationwide injunction to remedy the injuries of the nationwide class she seeks to represent." *Id.*  Plaintiffs cite a recent Tenth Circuit case for the proposition that "whether a named plaintiff in a nationwide class action could obtain a nationwide injunction was not a question of standing, but a question of whether the class met the requirements of Rule 23." *Id.*  Defendants do not reply directly to Plaintiffs' response; rather, they refer to their arguments about whether Plaintiffs sufficiently state class claims under Title III.

The Court agrees with the Plaintiffs that, as a purported class representative who can demonstrate standing to challenge SHR hotels' vehicle inaccessibility, Denny may seek a nationwide injunction against SHR hotels to remedy alleged injuries of the class she seeks to represent. *See Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1212-13 (10th Cir. 2014) ("The question whether an injunction may properly extend to [ ] stores nationwide is answered

by asking whether [plaintiff] may serve as a representative of a class that seeks such relief. All that is necessary to answer this question is an application of Rule 23.").

However, Defendants contend Denny fails to demonstrate standing with respect to the hotels she has contacted, The Oxford and TPS, because even as a tester, she does not allege she intends to contact the hotels again at any definite time.  Plaintiffs allege "Denny will continue to test [TPS and The Oxford] and other hotels covered by the putative class in this case by calling to see if wheelchair-accessible shuttle services are available several times per year."  FAC, ¶¶ 31, 36.

The Tenth Circuit has held that, where a plaintiff is a "tester" under Title III, evidence that the plaintiff intended to visit the place of accommodation "at least six times per year" was sufficient to demonstrate "a concrete present plan to return" to the place of accommodation. *Abercrombie*, 765 F.3d at 1211-12.  The court cited an earlier opinion, *Tandy v. Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004) (*id.*), which found that the plaintiff's averred intent to use the city's buses "several times per year" was not a "someday intention" proscribed by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), in which the plaintiffs "merely expressed a desire to *someday* visit places halfway around the world."  *Tandy*, 380 F.3d at 1284 (emphasis in original).

Defendants attempt to distinguish *Abercrombie* and *Tandy* factually, stating that *Abercrombie* involved a tester who claimed she would actually visit the defendants' stores six times per year, and that *Tandy* involved a plaintiff who had already used the city's buses and experienced delays due to lift malfunctions, and who asserted her intent to continue to use the buses.  Here, according to Defendants, Denny alleges she intends merely to "call" the hotels "several times per year," and such allegations fail to demonstrate a concrete, imminent injury.

The Court disagrees.  Taking Plaintiffs' allegations as true, Denny called The Oxford and

31

TPS on October 16, 2014, and was informed they did not offer wheelchair-accessible shuttle services.  FAC, ¶¶ 28, 33.  Denny alleges that, had the hotels offered such services, she would have stayed at the hotels and used the services; however, she was deterred from doing so.  FAC, ¶¶ 29, 34.  The Court finds these allegations demonstrate an injury to Denny.  As for the requested prospective injunctive relief and Denny's intent to return, Denny's allegation that she intends to call several times per year to see whether the hotels can accommodate her is no different than the tester in *Abercrombie* who expressed her intention to visit the defendants' stores; in either case, the testers intended to determine whether the places of public accommodation would provide the access they needed.  The Court finds the Plaintiffs' allegations more akin to the facts in *Abercrombie* and *Tandy* than to those in *Lujan* and, thus, the allegations plausibly state an "injury in fact" that is concrete, imminent, and not speculative.

Defendants also argue that CREEC's associational standing is limited to the standing of Denny.  All parties agree that "an organization suing as representative [must] include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association."  *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996).  However, Plaintiffs challenge Defendants' argument that because CREEC has not alleged any member with standing in their own right to pursue allegations related to hotels other than The Oxford and TPS, and Plaintiffs concede that Denny does not have standing on her own behalf to do so, CREEC's claims are solely limited to Denny's claims against The Oxford and TPS.  The Court finds that the scope of Denny's "standing" as to hotels other than The Oxford and TPS remains unresolved at this stage, since it will require analysis under Rule 23.  *See supra*.

Consequently, the Court respectfully recommends that the District Court **deny** the motions finding that Denny and CREEC have demonstrated standing to pursue claims under Title III against The Oxford and TPS and, further, that whether the Plaintiffs may pursue class claims for injunctive relief requires an application of Rule 23. *Abercrombie*, 765 F.3d at 1212-13.

## II.      Rule 12(b)(6) Defense

Finally, Defendants argue Plaintiffs' class allegations should be dismissed for failing to state a plausible claim for nationwide injuries pursuant to Fed. R. Civ. P. 12(b)(6).   Specifically, Defendants contend that Plaintiffs improperly rely on "information and belief" allegations and "assume that the accessibility violations Denny allegedly experienced were also experienced by others at seventy-five alleged SHR hotels across the country" and, thus, "this Court should dismiss or strike the class action allegations with respect to hotels for which Denny never contacted." Motion, docket #43 at 12-13.

Discrimination under Title III of the ADA can arise as "a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(I).  To state a claim under Title III, the Plaintiffs must show that: (1) Plaintiffs are disabled within the meaning of the ADA; (2) Defendants are private entities that own, lease, or operate the place(s) of public accommodation; (3) Plaintiffs were deprived of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; and (4) Defendants failed to make reasonable modifications that would accommodate Plaintiffs' disabilities

without fundamentally altering the nature of the public accommodation.[6] 42 U.S.C. § 12182(a) & (b); *see also Dahlberg*, 92 F. Supp. 2d at 1100.

The Court notes first that the present motions focus not on whether the purported class should be certified pursuant to Rule 23, as Defendants appear to suggest (Motion, docket #43 at 12-13; Reply, docket #102 at 14-15) but, rather, whether the allegations in the operative pleading plausibly state a Title III claim for relief pursuant to Rule 12(b)(6). Defendants analogize this case to *Colo. Cross-Disability Coalition ["CCDC"] v. Women's Health Care Assocs., P.C.*, No. 10-cv-01568, 2010 WL 4318845 (D. Colo. Oct. 25, 2010) in which the Honorable Richard P. Matsch found, with respect to the class allegations, that where the alleged discriminatory conduct was the defendant's refusal to engage the services of an interpreter from a particular agency selected by the plaintiff,

> The amended complaint does not describe the nature of the injunctive relief sought by the Colorado Cross-Disability Coalition. The allegations relate only to the defendant's failure to agree to Ms. Midthun's request for the services of a particular interpreter agency. That individual claim fails for the reasons set forth above. The amended complaint does not allege that the defendant has engaged in discriminatory conduct toward any other member of the Colorado Cross-Disability Coalition. Paragraph 41 of the amended complaint alleges that the defendant "maintains and/or engage [sic] in policies, practices and procedures that do not provide effective communication for patients who are deaf," but there are no factual allegations supporting that conclusion. No class-wide relief would be appropriate on the basis of these allegations.

*Id.* at *4. The Court finds the facts underlying Senior Judge Matsch's opinion are distinguishable from the circumstances of this case in material ways. For example, unlike in *CCDC*, the Plaintiffs' claim here does not allege the Defendants have provided accommodation but not a *particular type*

---

[6]*See Khalik*, 671 F.3d at 1191 (while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim.).

of accommodation.  In addition, unlike in *CCDC*, the Plaintiffs here have alleged discriminatory conduct against another of CREEC's members.  Finally, unlike in *CCDC*, the Plaintiffs here plead factual allegations supporting their claims, including that Denny and another wheelchair-bound CREEC member contacted 14 of SHR's 75 subject hotels (nearly 20%) at which they intended to stay, but the hotels informed the members they did not provide accessible transportation service.

Defendants also cite the opinion in *Twombly* to support their position.  However, in *Twombly*, unlike here, the "information and belief" allegations, which were held to be insufficient as merely "parallel conduct," were central to whether there was an illegal agreement and, thus, a violation of § 1 of the Sherman Act.  550 U.S. at 555-56.  Here, the Defendants do not specify how the "parallel conduct" analysis applies where there is no need to find agreement for a Title III violation.  Instead, *Twombly* stands for the proposition that "asking for plausible grounds to infer [a Title III violation] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [a Title III violation]."  *Id.* at 556.

Instructive to this analysis is the opinion in *Garner v. Vist Bank*, No. 12-5258, 2013 WL 6731903 (E.D. Pa. Dec. 20, 2013).  In *Garner*, the plaintiff brought a purported class action on behalf of himself and others similarly situated under Title III claiming the defendant's banks provided "no features to provide blind and visually-impaired users with the same level of privacy of input and output that is provided for sighted individuals."  *Id.* at *1.  The defendant moved to dismiss the action pursuant to Rule 12(b)(6) for failure to state a claim.  Applying the *Twombly/Iqbal* standards, the court concluded:

> Contrary to Defendant's contention, Garner has sufficiently pled a prima facie case
> of discrimination under the ADA. He is a blind individual and thus he is disabled.

> He claims that he was discriminated against on the basis of his disability because he was not able to use Defendant's ATM as a seeing individual would. Garner claims that Defendant's ATM was not equipped with functional voice-guidance to enable the visually impaired to protect their privacy information while using the ATM. Moreover, Garner claims that Defendant owns the subject ATM as well as others in its network, all of which are places of public accommodation that are intended to be used by all individuals and that affect commerce through their operations. 42 U.S.C. § 12181(2). Since Garner has alleged that he was discriminated against because of his disability by a place of public accommodation, he has adequately pled a claim upon which relief could be granted under the ADA.

*Id.* at 4.  As in *Garner*, the Court finds here, pursuant to Rule 12(b)(6), that the Plaintiffs state a plausible claim for relief under Title III.  First, there is no dispute that Denny is disabled under the Act.  Second, she alleges the Defendants are private entities that own, lease, or operate The Oxford and TPS, as well as other hotels in the SHR "portfolio," all of which are places of public accommodation. FAC, ¶¶ 11, 16.  Third, Denny alleges that she suffered discrimination based on her disability because she is unable to stay at The Oxford and TPS due to inaccessible transportation service.  *Id.*, ¶¶ 29, 34.  Finally, Plaintiffs allege that, prior to the litigation, they contacted SHR by letter, "explaining that many of their hotels are in violation of the transportation provisions of the ADA, and requesting that they bring their hotels into compliance. Sage did not respond to this letter." *Id.*, ¶ 42.  These allegations, taken as true, state a plausible claim of discrimination under Title III of the ADA.  *See Twombly*, 550 U.S. at 556.  The Court makes no findings as to whether the purported class should be certified pursuant to Rule 23.

Accordingly, the Court recommends that the District Court **deny** the Defendants' motion to dismiss the Plaintiffs' class action allegations pursuant to Rule 12(b)(6).

## CONCLUSION

This Court concludes Defendant Isenberg has demonstrated that the Court should not impose individual liability against him under the circumstances of this case.  However, Defendant SHR has

failed to show no genuine issues of material fact exist demonstrating it does not operate the subject hotels, and the Defendants have failed to persuade the Court that the class allegations should be dismissed for failure to state a claim.  Finally, the Plaintiffs have demonstrated they have standing to pursue claims under Title III against The Oxford and TPS and, further, that whether the Plaintiffs may pursue class claims for injunctive relief requires an application of Rule 23.

Accordingly, the Court respectfully RECOMMENDS that the District Court **deny** Defendant Sage Hospitality Resources' Motion to Dismiss Plaintiffs' First Amended Complaint [filed May 1, 2015; docket #43], in which Defendants Walter Isenberg and Sage Oxford, Inc. joined, and **grant** Defendant Isenberg's Motion to Dismiss Plaintiffs' First Amended Complaint [filed June 30, 2015; docket #58] to the extent it seeks to dismiss Isenberg as a Defendant in this case, but **deny** the motion in all other respects.[7]

DATED this 26th day of February, 2016, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

United States Magistrate Judge

---

[7]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).